JUDGMENT
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/5/2019

TYRONE PETERS,

                Plaintiff,

-against-

CORRECTION OFFICER HUTTEL *et al.*,

                Defendants.

15-cv-9274 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiff Tyrone Peters ("Plaintiff") brings this action, *pro se*, against Defendants Superintendent William Lee, Correction Officer ("CO") Lee Benford, CO Daniel Huttel, CO Jeffrey Erns, and Sergeant Duane Malark (collectively, "Defendants"). (Second Amend. Compl. ("SAC"), ECF Nos. 38, 45.[1]) In his complaint, Plaintiff assert several claims pursuant to 42 U.S.C. § 1983 ("Section 1983"), namely that (1) he was assaulted by several corrections officers on November 21, 2012, (2) Defendant Lee failed to protect him against that assault; (3) Defendant Lee retaliated against Plaintiff by interfering in disciplinary proceedings resulting from the November 21, 2012 attack; and (4) Defendant Benford used excessive force and/or retaliated against Plaintiff by intentionally hitting him with an electric gate on February 14, 2013. (*Id.*)

Before the Court is Defendants' motion for partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking dismissal of Plaintiff's (a) retaliation claim against Defendant Lee; (b) failure to protect claim against Defendant Lee; (c) excessive force and

---

[1] On June 16, 2017, Plaintiff moved for leave to file the Second Amended Complaint ("SAC") (*see* ECF No. 38, Ex A; *see also* Decl. of Assistant Att'y Gen. Yan Fu ("Fu Decl."), ECF No. 86, Ex. A.), which the Honorable Magistrate Judge Lisa Margaret Smith granted in part and denied in part on August 14, 2017 (ECF No. 46). Thereafter, on August 16, 2017, Magistrate Judge Smith made Plaintiff's proposed SAC the operative complaint, and in doing so (1) struck paragraphs 6, 7, 64-66, 68, and 70-87 from the SAC, (2) struck references to dismissed defendants Murphy and Ortiz from paragraphs 102 and 113 of the SAC, and (3) incorporated paragraphs 7, 8, 10-11, 29-33, and 36-39 from Plaintiff's reply to Defendants' opposition to the motion to amend (ECF No. 45 ("SAC Reply")). (*See* ECF No. 47.)

retaliation claims against Defendant Benford, and (d) to the extent stated, the conspiracy claim against Defendants Benford, Huttel, Erns, and Malark arising from the February 14, 2013 incident (the "Motion"). (ECF No. 80.) For the following reasons, the Motion is GRANTED in its entirety.

## **BACKGROUND**

The following facts are taken from the Defendants' unopposed Local Civil Rule 56.1 Statement of Undisputed Material Facts (ECF No. 81 ("Defs. 56.1")), Plaintiff's Affidavit in Opposition to Defendants' Motion (ECF No. 88 ("Pl. Aff.")) ("Opposition"), and the parties' affidavits, declarations, and exhibits.[2] They are not in dispute unless otherwise noted.

### A. The November 21, 2012 Incident

#### a. The Grievance Process at Green Haven

At Green Haven, as well as other New York State Department of Corrections and Community Supervision ("DOCCS") facilities, the grievance process is not adversarial. (Decl. of William Lee ("Lee Decl."), ECF No. 82, at ¶ 6.) In fact, the filing of a grievance or other complaint by an inmate will not, itself, initiate a disciplinary process. (*Id.*) Instead, when filed, grievances at Green Haven undergo an investigation. (Defs. 56.1 ¶ 10.) Investigators will prepare a memo summarizing their investigation, which, if an injury is claimed in the grievance, can involve obtaining medical records, inmate injury reports, or pictures. (*Id.* ¶ 10; Lee Decl. ¶ 7.)

---

[2]    Although Plaintiff submitted his Opposition to the Motion and received proper notices of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 (ECF No. 87), he failed to submit a responsive Rule 56.1 statement. For this reason, Defendants urge the Court to deem the statements contained in Defendants' Rule 56.1 Statement as undisputed. (Defs. Reply Mem. of Law in Support of Defs. Mot. ("Defs. Reply"), ECF No. 90, at 2.) Given Plaintiff's *pro se* status, the Court will decline to do so automatically and will instead look to Plaintiff's Opposition, as well as conduct an independent review of the record, to aid in ascertaining disputed and undisputed facts. *See Morales v. City of New York*, No. 13-cv-7667 (RJS), 2016 WL 4718189, at *1 n.1 (S.D.N.Y. Sept. 7, 2016) (considering Plaintiff's affidavit in opposition to summary judgment and conducting an independent review of the record, notwithstanding fact that Plaintiff failed to oppose Defendants' Local Civil Rule 56.1 Statement); *see also Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court 'is not required to consider what the parties fail to point out' in their Local Rule 56.1 statements, it may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement.").

Once a superintendent receives that summary, he or she can, in turn, either request additional information, conclude that the grievance is unsubstantiated, or refer the grievance to the DOCCS Office of Special Investigations ("OSI").[3] (Defs. 56.1 ¶¶ 10, 17; Lee Decl. ¶¶ 7-8.) If a grievance is referred to it, OSI will conduct its own investigation and refer any substantiated allegations to the DOCCS's Bureau of Labor Relations ("Labor Relations"), which can take disciplinary action if necessary. (Lee Decl. ¶ 12; Defs. 56.1 ¶ 19.)

Superintendents are also allowed to refer allegations directly to Labor Relations if an employee's conduct warrants such action. (Lee Decl. ¶ 13.) However, because he does not have the resources available to conduct investigations that will provide sufficient information to establish the requisite burden of proof for a hearing, Defendant Lee refers matters to OSI, rather than Labor Relations, if he believes that an allegation requires more thorough inquiry. (*Id.*)

### b. Defendant Lee's Awareness (or Lack Thereof) of Prior Incidents Involving Defendants Huttel, Erns, and Malark

On several occasions during his time as superintendent, Defendant Lee has referred grievances alleging assault or retaliation to OSI. (Lee Decl. ¶¶ 7-8, 13.) Defendant Lee cautions, however, that grievances are merely allegations and do not reflect the actual number of assaults or incidents of misconduct by staff. (*Id.* ¶ 15; *see also* Defs. 56.1 ¶¶ 11-13.) Furthermore, Defendant Lee avers that "the possibility that a particular officer's name appears in multiple grievances does not establish that the officer has an issue with misconduct," particularly if an officer works in close quarters with inmates. (Lee Decl. ¶ 18; Defs. 56.1 ¶ 14.)

According to Defendant Lee, he received, on or before March 23, 2012, a report of staff misconduct grievances at Green haven. (Lee Decl. ¶ 16.) Defendant Lee's review of that report

---

[3]     OSI may also initiate investigations based on complaints received directly from inmates or staff or on its own initiative. (Defs. 56.1 ¶ 16; Lee Decl. ¶ 10.)

did not reveal anything atypical about the facility. (*Id.*) In fact, in Defendant Lee's view, the report corroborated "what [he] knew from making rounds throughout the facility, talking to staff and inmates, and receiving feedback from" various supervisors and officials—Green Haven's issues were typical of a large maximum-security facility. (*Id.* ¶ 17.) Defendant Lee further maintains that, had there been substantial issues at Green Haven, he would have been informed by DOCCS's Central Office in Albany.[4] (*Id.*)

Defendant Lee notes that he had never been informed by Central Office that there were an unusual number of complaints or OSI investigations related to staff assaults at Green Haven. (*Id.*) In particular, Central Office never indicated that Defendants Huttel, Erns, and Malark were involved in an abnormally high number of complaints, nor was Defendant Lee personally aware of any substantiated inmate grievances alleging assault by any of those three defendants. (*Id.* ¶¶ 18-19; *see also* Defs. 56.1 ¶¶ 20-21.)

Plaintiff nevertheless contends that Defendant Lee was aware of "continuous grievances filed against" Defendants Huttel, Erns, and Malark, and offers several affidavits in support. (Pl. Aff. ¶ 21.) For example, Charles Moreman, an inmate currently incarcerated at the Wende Correctional Facility, affirms that he "witnesse[d] on more than Four [4] occasions from 2011 ~ 2013 [Defendant] Huttel, aka 'The Enforcer'" beat up inmates that disrespected his wife" (the "Moreman Affidavit"). (Pl. Aff. Ex. H at 1.) Moreman states that he "personally complained to [Defendant] Lee" about this conduct, including "in the Summer of 2012," but Defendant Lee apparently sided "with his officers['] tactics[] of disciplining inmates." (*Id.* at 1-2.) However, during his deposition, Moreman conceded that he had never actually seen Defendant Huttel use excessive force on any inmate. (Decl. of Yan Fu in Further Support of Defs. Mot. for Summary

---

[4]     The DOCCS central office is comprised of the Central Office Review Committee, OSI, Labor Relations, the Commissioner, and the Deputy or Assistant Commissioner. (Lee Decl. ¶ 17.)

Judgment ("Fu Reply Decl."), ECF No. 91, Ex. A at Tr. 14:5-9.) And when asked if he had ever witnessed an officer assault an inmate while at Green Haven, Moreman only stated that he had heard "somebody yelling" about an altercation. (*Id.* Tr. 15:22-25.)

Plaintiff also provided an affidavit by Timothy Scott (the "Scott Affidavit"), another inmate currently at Wende Correctional Facility. Scott avers that attacks against inmates were "a continuous thing at Green Haven Correctional Facility between 2010-13" but that Defendant Lee denied those complaints/grievances. (Pl. Aff. Ex. I at 2.) Scott states that he "personally asked [Defendant] Lee to have his Officers stop the assaults on inmates."[5] (*Id.*)

Finally, Plaintiff cites to his own personal knowledge of grievances that had been filed. During his January 17, 2018 deposition (the "January 2018 Deposition"), Plaintiff explained that he knew of two inmates who had informed him that they each had filed separate grievances, one regarding assault and the other regarding harassment. (Fu Decl. Ex. D at Tr. 22:8-24:3.) When pressed for more details, Plaintiff indicated that he was aware of "more than two" grievances, although he could not recall if there were "more than five." (*Id.* Tr. 26:5-8.) Plaintiff also points to several lawsuits that have been filed against the CO defendants, one of which named Defendant Lee as a defendant.[6] (Pl. Aff. Exs. J & K.) Defendant Lee retorts, however, that (1) unless he was a defendant, he would not have had knowledge of a lawsuit and (2) the fact that a lawsuit names an officer as a defendant does not establish an issue with misconduct.[7] (Lee Decl. ¶ 21.)

---

[5]    Scott states that Lee warned him that he "might be next to be assaulted if [he] ke[pt] complaining." (*Id.*)
[6]    Plaintiff also seems to point to another case where an Inmate Liaison Committee member presented evidence to the Court that the ILC had complained to Defendant Lee. (*Id.* ¶ 25.) Plaintiff, however, does not provide the case name or citation, and does not include the case as an Exhibit.
[7]    Plaintiff's Opposition attaches an article written by Joe Watson, titled "New York DOCCS Has Paid $10 Million to Prisoners Beaten by Guards Over Five-year Period." (Pl. Aff. Ex. F.) The Court will not incorporate this article into the record in rendering a decision on the Motion. The article constitutes inadmissible hearsay and does not fall under any of the enumerated hearsay exceptions. *See Allen v. City of New York*, 480 F. Supp. 2d 689, 720 (S.D.N.Y. 2007) ("The Court, however, cannot consider this article in assessing Allen's opposition to summary judgment. Such evidence constitutes inadmissible hearsay, which is 'unusable to defeat summary judgment.'").

### c. The Alleged Assault by Defendants Huttel, Erns, and Malark

On November 21, 2012, Plaintiff—at the time an inmate at the Green Haven Correctional Facility ("Green Haven")—was working as a porter in the F-Block of the facility. (Defs. 56.1 ¶ 1; SAC ¶¶ 1, 21.) At approximately 9:05 a.m. that day, an incident occurred between Plaintiff and a female correctional officer. (SAC ¶ 22-23.) Specifically, Plaintiff was accused of calling the female correctional officer a derogatory term and threatening to kill her. (SAC ¶ 23; Fu Decl. Ex. E at DEFENDANTS 0080.) Following the incident, Plaintiff received a misbehavior report ("MBR") from non-defendant CO Drown. (Defs. 56.1 ¶ 7; Fu Decl. Ex. E at DEFENDANTS 0080.) The MBR cited Plaintiff for violating DOCCS disciplinary rules 106.10 (refusing a direct order), 102.10 (threats), 107.11 (harassment of an employee), and 104.11 (violent conduct). (Defs. 56.1 ¶ 7; Fu Decl. Ex. E at DEFENDANTS 0077.)

The issuance of the MBR required that Plaintiff be sent to Green Haven's Special Housing Unit ("SHU"). (*See* SAC ¶ 25.) Thus, later that day, at approximately 12:30 p.m., Defendants Erns and Malark came to Plaintiff's cell to escort him to SHU. (Defs. 56.1 ¶ 8.) After handcuffing Plaintiff and navigating him down stairs to exit the F-Block, Defendant Malark allegedly called over the radio and requested that the hallway to SHU be cleared. (SAC ¶¶ 26-27.) As the group exited the F-Block, Defendant Huttel approached and inquired as to why Plaintiff was being transported to SHU. (*Id.* ¶ 28.) Defendant Erns responded that Plaintiff had threatened a female corrections officer. (*Id.*) The three defendants then proceeded to assault him. (Defs. 56.1 ¶ 8.)

Several weeks later, on December 7, 2012, Plaintiff wrote a grievance regarding the incident. (Fu Decl. Ex. L at DEFENDANTS 0006-0008.) The grievance was filed with the Green Haven Inmate Grievance Program Supervisor on December 13, 2012 and assigned grievance number GH-74304-12. (Defs. 56.1 ¶ 22; Fu Decl. Ex. L at DEFENDANTS 0009.) The grievance

makes no allegation against Defendant Lee; rather, it entirely focuses on the conduct of Defendants Huttel, Erns, and Malark. (Defs. 56.1 ¶ 24; Fu Decl. Ex. L at DEFENDANTS 0006-0008.) On March 11, 2013, Defendant Lee denied the grievance, and the decision was affirmed by the DOCCS Central Office Review Committee ("CORC") on August 14, 2013 (Fu Decl. Ex. L at DEFENDANTS 0001, 0005.)

## B. The Disciplinary Hearing

Because Plaintiff received an MBR for his alleged conduct, a Tier III Disciplinary Hearing ("Tier III Hearing") was held. (Fu Decl. Ex. F at Tr. 1.) Pursuant to DOCCS Directive 4932, Defendant Lee appointed Commissioner's Hearing Officer Bruce Levine ("CHO Levine") to conduct the hearing. (*Id.* Ex. E at 0082; Defs. 56.1 ¶ 29.) The hearing was conducted over the course of a month, between November 28, 2012 through December 21, 2012. (Fu Decl. Ex. F at Tr. 1.) At the hearing's conclusion, CHO Levine found Plaintiff guilty of all four violations in the MBR. (*Id.* Ex. E at 0077.)

Plaintiff alleges that various instances of impropriety occurred during the hearing, all of which were driven by Defendant Lee.[8] It is Plaintiff's position that Defendant Lee's conduct was in retaliation for Plaintiff filing grievances. A summary of those alleged instances of retaliation are summarized below.

*First*, Plaintiff maintains that Defendant Lee appointed CHO Levine to find him "guilty of the false misbehavior report"[9] (SAC Reply ¶ 29.) However, at his deposition, could not recall the

---

[8] Plaintiff also argues that Defendants "intentionally destroyed or tampered with the Hearing Tape to cover up the violations," which, Plaintiff contends, is a breach of Defendant Lee's duty to maintain a good record of the Tier III Hearing. (Pl. Aff. ¶ 15.) To the extent Plaintiff states a due process violation, such claims were dismissed in Magistrate Judge Smith's August 14, 2017 Opinion and Order. (*See* ECF No. 46 at 16 n.6.) Further, to the extent Plaintiff raises spoliation concerns, Magistrate Judge Smith denied Plaintiff's previous motion for sanctions on February 16, 2018. (ECF No. 64.)

[9] Relatedly, Plaintiff contends that on November 28, 2012, before the hearing began, CHO Levine offered him a sentence of 45 days at the direction of Defendant Lee, although this conversation is not reflected in the record. (Pl. Aff. Ex. D ¶ 3.) Plaintiff declined. (*Id.*)

substance of his factual assertion, citing the unavailability of his notes. (Fu Decl. Ex. D at Tr. 30:1-10.) Defendant Lee has stated that CHO Levine's primary role is to conduct hearings and he did not appoint CHO Levine for the purpose of finding Plaintiff guilty. (Lee Decl. ¶ 23.)

*Second* several days later on December 5th, Plaintiff informed CHO Levine that he was concerned that a sergeant—who, as CHO Levine noted, had "nothing to do with [Plaintiff's] case"—entered the room and "looked at [him]."[10] (Fu Decl. Ex. F at Tr. 73:19-74:25.) When Plaintiff raised the issue to CHO Levine, he responded that he "didn't see any look" but nevertheless reiterated that the sergeant's conduct had "nothing to do with [Plaintiff's] hearing" and had "no impact on it one way or the other." (*Id.* Tr. 74:22-25; *see also id.* Tr. 119:16-25 ("I've already dealt with the issue you raised [] about Sergeant Hudson before, but to the extent that you didn't raise it as an objection . . . it has no impact on this hearing and that that he was coming . . . therefore the objection is denied.").) Plaintiff maintains that the sergeant acted at the direction of Defendant Lee (Pl. Aff. Ex. D ¶ 5), while Defendant Lee contends that he was unaware of any incident at the hearing and did not order any such conduct (Lee Decl. ¶ 25; Defs. 56.1 ¶ 33).

*Finally*, Defendant Lee purportedly called at multiple points during the hearing and demanded that CHO Levine find Plaintiff guilty. Some of these calls were off the record, while some were during the hearing.[11] (Pl. Aff. ¶ 10.) Plaintiff maintains that, at some point, CHO Levine "paused the tape" to call Defendant Lee and "ask him . . . advice or whatever it was." (*Id.* Tr. 30:10-18.) When pressed on how he knew it was Defendant Lee, Plaintiff stated that CHO Levine had "asked for Lee." (*Id.* Tr. 37:3-6.) And when asked about the substance of Defendant Lee's conversation with CHO Levine, Plaintiff testified that the believed it involved CHO Levine

---

[10]     Although there is no indication of this in the hearing transcript, Plaintiff contends that the look was "intimidating" and accompanied by "assaultive gestures." (Pl. Aff. ¶ 8.)
[11]     During his deposition, Plaintiff could not recall when during the hearing the conversation between Defendant Lee and CHO Levine took place. (Fu Decl. Ex. D at Tr. 34:19-35:8.)

inquiring as to whether Defendant Lee "wanted [him] to find [Plaintiff] guilty on all the charges." (*Id.* Tr. 36:6-20.) Defendant Lee again disputes Plaintiff's account; instead, he contends that he never ordered CHO Levine to find Plaintiff guilty of the charges in the MBR. (Lee Decl. ¶ 24; Defs. 56.1 ¶ 31.)

Plaintiff did not file a formal grievance related to any of the incidents that occurred during the Tier III Hearing. Rather, the only two grievances Plaintiff filed at Green Haven are related to the November 21, 2012 incident (GH-74304-12) and, as detailed below, the February 14, 2013 incident (GH-74737-13). (*See* Decl. of Rachel Seguin, ECF No. 83, Ex. A at 2.) The record is also devoid of any evidence that indicates Plaintiff raised a complaint about this issue via any other channels, whether formal or informal.

## C. The February 14, 2013 Gate Incident

### a. The Gate Closing

On February 14, 2013, at about 11:15 a.m., C.O. Jason Brothers and Sergeant Kelly were escorting Plaintiff from the SHU at Green Haven to the Old Visiting Room ("OVR"). (Fu Decl. Ex. M at 0021; Decl. of Lee Benford ("Benford Decl."), ECF No. 84, at ¶ 9; Decl. of Jason Brothers ("Brothers Decl."), ECF No. 85, at ¶ 3.) Around this same time, Defendant Benford received a radio transmission advising him that an escort would be coming through the gate control area in Green Haven's Building 2[12]—where Defendant Benford was working—and he, in turn, opened the gate so as to allow the group to pass through. (Benford Decl. ¶¶ 6-7; Defs. 56.1 ¶ 40.)

Eventually, Plaintiff reached the area and began passing through the gate. (Defs. 56.1 ¶ 42.) Defendant Benford believed Plaintiff had cleared the gate, so he hit the button to close the gate.

---

[12] Defendant Benford explains that he did not know the identity of the inmate at the time and did not learn that the inmate was Plaintiff until "[y]ears later." (*Id.*)

(Benford Decl. ¶ 9.)  The gate then struck Plaintiff's right shoulder.[13]  (Brothers Decl. ¶ 4.)  Defendant Benford hit the stop button, causing the gate to stop in a partly opened position.  (Benford Decl. ¶ 9.)  CO Brothers asked if Plaintiff was okay, to which Plaintiff answered in the affirmative.  (Brothers Decl. ¶ 4; Defs. 56.1 ¶ 44.)  The escort then continued without any further issue.  (*See* Defs. 56.1 ¶ 44.)

The next day, Plaintiff complained of shoulder and lower back pain and was seen by Green Haven medical staff.  (*Id.* ¶ 45; *see also* Fu Decl. Ex. I at DEFENDANTS 0028.)  Plaintiff's Inmate Injury Report ("IIR") states that his shoulder had full range of motion and no visible injuries, although it was tender to touch and there was "minor pain on palpation."  (Fu Decl. Ex. I at DEFENDANTS 0028.)  As to his back, again, the IIR notes that Plaintiff had no visible bruising or injuries, no swelling, and full range of motion.  (*Id.*)  Similarly, Plaintiff's Ambulatory Health Record Progress Report ("AHRPR") noted that his lower back had "minor pain on palpa[tion]."  (*Id.* at DEFENDANTS 0273.)  Overall, the AHRPR concluded that Plaintiff was "no obvious distress and appear[ed] in his normal state of mind."  (*Id.*)  Plaintiff was directed to use Bengay and to continue using medication (Ibuprofen and Flexeril) for a pre-existing injury.[14]  (*Id.* at DEFENDANTS 0028, 0273.)

On February 20, 2013, Plaintiff filed a grievance related to the gate incident, which was assigned grievance number GH-74737-13.[15]  (Fu Decl. Ex. M at DEFENDANTS 0023.)  Among other things, Plaintiff requested that Defendant Benford be "re-trained on handling the operation of [the] electronic gate so no more incident[s] [] occur."  (*Id.*)  The grievance was received on March 6, 2013, and on March 28, 2013, Defendant Lee denied it.  (*Id.* at DEFENDANTS 0022.)

---

[13]    Plaintiff states that the gate closing on him caused him to "spin around."  (Pl. Aff. ¶ 55.)
[14]    The AHRPR excerpts submitted by Plaintiff indicate that on or about January 22, 2013, Plaintiff suffered an injury to his back because he had fallen out of his bed in the SHU.  (Pl. Aff. Ex. N at DEFENDANTS 0276.)
[15]    Plaintiff re-submitted the grievance on February 27, 2013.  (Fu Decl. Ex. M at DEFENDANTS 0024.)

In his denial, Defendant Lee again confirmed that the medical staff noted no signs of visible injury. (*Id.*)

Plaintiff then appealed the decision to CORC on April 8, 2013. (*Id.*) In his appeal statement, Plaintiff now also alleged that Defendant Bedford used the gate to hit Plaintiff in retaliation for the grievance filed on November 21, 2012. (*Id.*) On August 21, 2013, CORC unanimously denied the appeal, and in doing so, it noted that it had "not been presented with sufficient evidence to substantiate any malfeasance by staff." (*Id.* at DEFENDANTS 0016.)

### b. The Alleged Retaliatory Motive

According to Plaintiff, on March 29, 2013, Defendant Benford came to Plaintiff's cell and told him that he hit him with the gate to "teach [him] a lesson" about not "threaten[ing] another female officer ever again." (SAC ⁋ 109; *see also* Pl. Aff. ⁋ 59.) At his March 27, 2017 deposition, Plaintiff testified that Defendant Benford "hit [Plaintiff] with the gate because . . . [Plaintiff] [was] disrespecting a female officer." (Fu Decl. Ex. C at Tr. 95:19-96:7.) As Plaintiff puts it, Defendant Benford acted on behalf of Defendants Huttel and Erns. (Pl. Aff. ¶ 68.)

Plaintiff also draws support from Moreman, who explains that

> at about 5:00 pm, on March 29th, 2013 . . . I witnessed [Defendant] Benford . . . walk[] up to inmate Tyrone Peters['s] . . . cell and threaten[] him, saying "I intentionally hit you with the electronic gates on Valentine's Day February 14th, 2013 to teach you a lesson after CO. Erns, and CO. Huttel[] told me that you threatened a female CO. to kill her and then wrote a grievance against Huttel[] and Erns[] for beating you up and sending you to the [S.H.U.] Special Housing Unit."[16]

(Pl. Aff. Ex. H at 1.)

---

[16]     The Moreman Affidavit comports with Plaintiff's new contention that Defendant Benford retaliated against Plaintiff for not only purportedly threatening a female officer *but also*—as Plaintiff contends for the first time in his Opposition—because he filed a grievance against Defendants Huttel and Erns. (Pl. Aff. Ex. D ⁋ 9.) Plaintiff's newest account is at odds with both his original allegation and his earlier testimony that only connected the retaliatory motive to Plaintiff's alleged threatening of a female officer. The Court will disregard this updated factual assertion, although it notes that it does not impact the resolution of the Motion.

Defendant Benford wholly disputes Plaintiff's account. (Benford Decl. ¶ 2.) He maintains that he does not know Plaintiff and has no recollection of visiting, let alone conversing, with Plaintiff on March 29, 2013. (*Id.* ¶¶ 3, 12; Defs. 56.1 ¶ 34.) Defendant Benford further explains that he (1) does not know CO Drown—the female officer Plaintiff allegedly threatened; (2) was not aware of any MBR filed against Plaintiff on November 21, 2012; (3) did not know why Plaintiff was being kept in the SHU; and (4) "did not conspire, meet with, or discuss plans with [Defendant] Huttel, [Defendant] Erns, [Defendant] Malark or anybody else, to hit plaintiff with a gate." (Benford Decl. ¶¶ 4, 13; Defs. 56.1 ¶ 35.)

## **LEGAL STANDARD**

### I. **Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

In deciding a motion for summary judgment, a court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted). However, a court should grant summary judgment when a party who bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323 (internal quotation marks omitted). "[W]hen confronted with evidence of facts that would support summary judgment, the [nonmoving party] must come forward with evidence in admissible form that is capable of refuting those facts." *George v. Rockland State Psychiatric Ctr.*, No. 10-cv-8091(NSR), 2014 WL 5410059, at *3 (S.D.N.Y. Oct. 23, 2014) (quoting *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 177 (S.D.N.Y. 2009)) (internal quotation marks omitted). The nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted). Further, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

A party must support its position by citing to materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c)(1). Affidavits may be used to support or oppose summary judgment if the affidavit is "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see also DiStiso v. Cook*, 691 F.3d 226, 230 (2d. Cir. 2012). Importantly, a court may only consider facts that are admissible in evidence. *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir. 1997).

Where, as here, a party is proceeding *pro se*, courts have an obligation to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Perez v. Metro. Corr. Ctr. Warden*, 5 F. Supp. 2d 208, 211 (S.D.N.Y. 1998) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). However, a *pro se* plaintiff, when responding

to a motion for summary judgment, is still required to rely on more than the allegations in their complaint. *Wali,* 678 F. Supp. 2d at 177. Moreover, *pro se* plaintiffs cannot overcome a motion for summary judgment by simply making "bald" assertions that are unsupported by the evidence. *Shariff v. Poole*, 689 F. Supp. 2d 470, 476 (S.D.N.Y. 2010).

## II.     Section 1983

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see also Patterson v. Cty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). To maintain a Section 1983 claim, a plaintiff must establish two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges. *See Annis v. Cty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *Quinn v. Nassau Cty. Police Dep't*, 53 F. Supp. 2d 347, 354 (E.D.N.Y. 1999) (noting that Section 1983 "furnishes a cause of action for the violation of federal rights created by the Constitution" (citation omitted)).

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Spavone v. N.Y.S. Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) (citation omitted). A defendant's supervisory authority is insufficient in itself to demonstrate liability under Section 1983. *LaMagna*

*v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012) (citing *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003)).  Indeed, "vicarious liability is in applicable to [Section] 1983 suits," meaning that a plaintiff must establish that the defendant, through his or her "own individual actions, has violated the Constitution."  *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014).

To that end, the personal involvement of a supervisory defendant may be shown by evidence that

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Brandon v. Kinter*, 938 F.3d 21, 37 (2d Cir. 2019) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

## DISCUSSION

**I.  Plaintiff's Claims Against Defendant Lee**

**A.  Failure to Protect Claim**

**a.  Exhaustion**

Plaintiff alleges that Defendant Lee "failed to protect [him] from the November 21, 2012 assault by [Defendant] Huttel, [Defendant] Erns and [Defendant] Malark."  (Pl. Aff. ¶ 21.)  In response, Defendants argue, in part, that Plaintiff never filed a grievance related to "how [Defendant] Lee or anybody else in the Green Haven administration failed to protect plaintiff from being assaulted." (Defs. Mot. 18.)  Defendants, as such, maintain that Plaintiff did not exhaust his administrative remedies with regard to his failure to protect claim.  (*Id.*)  The Court agrees.

In general, prior to initiating suit in federal court, inmates are required to exhaust their administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"). *See* 42 U.S.C. § 1997e(a); *see also Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). To properly exhaust a grievance, "'a prisoner must grieve his complaint about prison conditions up through the highest level of administrative review' before filing suit." *See McCoy v. Goord*, 255 F. Supp. 2d 233, 246 (S.D.N.Y. 2003) (quoting *Porter v. Goord*, No. 01 Civ. 8996(NRB), 2002 WL 1402000, at *1 (S.D.N.Y. June 28, 2002)). Exhaustion of administrative remedies under PLRA requires completion of the administrative appeal process in conformance with rules of the particular institution in which they are confined. *See Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012). This applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002)).

New York's grievance process, known as the Inmate Grievance Program ("IGP"), generally provides a three-tiered formal procedure for all grievances. *See* 7 N.Y.C.R.R. § 701.5. Under the IGP, "[i]n addition to the grievant's name, department identification number, housing unit, program assignment, etc., the grievance should contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint." *Id.* § 701.5(a)(2). An inmate need not "identify the responsible parties in his grievance in order to later name them as defendants," *Espinal*, 558 F.3d at 127, but "the mere fact that plaintiff filed some grievance, and fully appealed all the decisions on that grievance, does not automatically mean that he can now sue anyone who was in any way connected with the events giving rise to that grievance." *Turner v. Goord*, 376 F. Supp. 2d 321, 324-25 (W.D.N.Y. 2005).

"[A] claim may be exhausted when it is closely associated with, but not explicitly mentioned in, an exhausted grievance. *See Percinthe v. Julien*, No. 08 Civ. 893(SAS), 2009 WL 2223070, at *5-6 (S.D.N.Y. July 24, 2009). Nevertheless, the grievance must allow a claim to be "properly investigated" and "specifically addressed" in the prison's denial of the grievance. *Id.* (citing *Espinal*, 558 F.3d at 128) (concluding that failure to protect claim had not been exhausted where the grievance, as well as the subsequent investigation and decision responding to it, only addressed excessive force claim contained therein). At bottom, the question is "whether plaintiff's grievance sufficiently alerted prison authorities that he was alleging some wrongdoing." *Turner*, 376 F. Supp. 2d at 325.

Here, Plaintiff maintains that he exhausted his administrative remedies concerning the assault by Defendants Huttel, Erns, and Malark, and that, therefore, he exhausted his claims against Defendant Lee. (Pl. Aff. ¶ 39, 41.) Specifically, Plaintiff contends that, in essence, his failure to protect claim is "closely associated with" his grievance against correction officers. (*Id.*) Not so. A review of Plaintiff's December 7, 2012 grievance reveals that Plaintiff did not raise concerns about ongoing or longstanding issues with correctional officer behavior at Green Haven, nor were such concerns raised before CORC. Rather, the grievance, at most, makes a request that the officers "should be investigated and . . . should be penalized . . . to eliminate further violations and [b]ad [a]cts." (Fu Decl. Ex. L at DEFENDANTS 0006.) The record is also clear that the grievance, as drafted, did not lend itself to a review of and decision on Plaintiff's failure to protect claim, as all that was addressed was his excessive force issues. *See Percinthe*, 2009 WL 2223070 at *5-6. Based on this undisputed evidence, it is clear that Plaintiff failed to exhaust his administrative remedies. As such, the Court GRANTS summary judgment for Defendants as to Plaintiff's failure to protect claim.

### b. Merits

Even if Plaintiff did exhaust his remedies, summary judgment would still be warranted. Plaintiff has alleged that Defendant Lee failed to protect him by not taking "proper investigative actions . . . and corrective measures" in response to past allegations of inmates being assault by staff. (SAC ¶ 69.) Specifically, Plaintiff maintains that Defendant Lee was "grossly negligent in managing subordinates" because he "was aware of the continuous grievances filed against [Defendants Huttel, Erns, and Malark], the multiple verbal complaints, the multiple law suits [sic] and the continuous Inmate Liaison Committee meetings." (SAC Reply ¶¶ 36-38.) Defendants argue, however, that Defendant Lee is entitled to summary judgment on this claim based on the undisputed evidence. (Defs. Mem. of Law in Support of Partial Mot. for Summary Judgment ("Defs. Mot."), ECF No. 89, at 12.) Specifically, Defendants contend that Defendant Lee did not "perceive an unusual number of grievance complaints alleging inmate assault on the part of" Defendants Huttel, Erns, or Malark, and Plaintiff has not put forth evidence establishing an "unusually high number" of grievances for Defendant Lee to knowingly disregard. (*Id.* at 12-13.) The Court agrees.

Under the Eighth Amendment, prison officials "must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). If they act with "deliberate indifference" to inmate safety, prison officials will be liable for the harm later incurred by an inmate. *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). The test for establishing deliberate indifference to inmate safety has an objective component and subjective component. *First*, under the objective prong, plaintiffs must show that they were "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. *Second*,

under the subjective prong, plaintiffs must establish that the prison official acted with a "sufficiently culpable state of mind." *Id.*

To evaluate culpability, a prison official must know that the plaintiff "face[d] a substantial risk of harm and he [or she] disregard[ed] that risk by failing to take reasonable measures to abate the harm." *Hayes*, 84 F.3d at 620 (citing *Farmer*, 511 U.S. at 842, 845). In assessing knowledge, the prison official need not be "aware[] of the specific risk to the plaintiff or from the assailant." *Warren v. Goord*, 579 F. Supp. 2d 488, 495 (S.D.N.Y. 2008). Rather, the risk may come from a "single source or multiple sources" and may be a risk that all prisoners in the plaintiff's position face. *Id.* (quoting *Farmer*, 511 U.S. at 843). A factfinder may, of course, infer knowledge if there is "evidence that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past.'" *Farmer*, 511 U.S. at 842-43. However, circumstances must "suggest that the defendant-official being sued had been exposed to information concerning the risk." *Id.* at 842.

As an initial matter, the undisputed evidence establishes that Defendant Lee was not aware of an abnormally high number of inmate grievances against Defendant Huttel, Defendant Erns, or Defendant Malark. (Defs. 56.1 ¶ 15.) For example, at his deposition, Plaintiff only identified two specific grievances against Defendant Erns and Malark that were filed by other inmates.[17] (Fu Decl. Ex. D at Tr. 23:15-24:15.) And, notably, only one of those grievances was for assault. (*Id.* Tr. 23:15-17.) In any event, as Defendant Lee notes (Lee Decl. ¶ 15), the grievances are only allegations and Plaintiff has not offered evidence showing that any of the grievances had merit or warranted further investigation. Thus, this record plainly fails to establish Defendant Lee's knowledge of any *substantiated* grievances related to Defendants Huttel, Erns, and Malark, or that

---

[17] To be sure, Plaintiff had difficulty remembering the exact number of grievances, but even so, he still could only approximate that he thought there were "more than two." (Fu Decl. Ex. D at Tr. 24:12-15.)

there was either a specific threat against Plaintiff or a substantial risk of harm that was longstanding, pervasive, and well-documented at Green Haven.[18]

The Moreman Affidavit does not alter this conclusion. As previously noted, Moreman affirmed that he witnessed Defendant Huttel beat up inmates on more than four occasions over a two-year period. (Pl. Aff. Ex. H at 1.) The Moreman Affidavit, however, is belied by his sworn testimony, which reveals that he had neither (1) "physically seen" Defendant Huttel assault an inmate nor (2) seen Defendants Erns or Malark use excessive force. (Fu Reply Decl. Ex. A at Tr. 14:5-15:8.) Moreman could only recall was that he became aware of unspecified correction officers assaulting an inmate when he heard someone yelling "they just beat this young kid up." (*Id.* Tr. 15:19-25.) And, although Moreman notes in his affidavit that he "personally complained" to Defendant Lee, the record is silent as to Defendant Lee's response to or investigation of the complaint's substance and credibility (if any).[19] *See Greenwaldt v. Coughlin*, No. 93 Civ. 6551 (LAP), 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."). Simply put, the Moreman Affidavit fails to create a genuine issue of fact as to Defendant Lee's knowledge of a longstanding issue of correctional officer violence or a specific threat to Plaintiff.

---

[18]    Defendants provided the Court with a copy of *Wilson v. Corr. Sgt. Gurreno*, No. 10 Civ. 5901 (PGG), ECF No. 39 (S.D.N.Y. June 18, 2012) (*see* Fu Decl. Ex. K) and now urges it to adopt a similar reasoning regarding how grievances implicate personal knowledge. *Wilson* dealt with a motion to amend, such that its utility in the summary judgment context is limited. Nevertheless, the Court finds the court's reasoning is persuasive as to why mere knowledge grievances does not, alone, establish knowledge of a threat of violence.

[19]    As previously noted, Lee affirmed that he would have forwarded complaints made outside the grievance process to OSI, and that he had no role in the OSI investigation once he made the referral. (Lee Decl. ¶¶ 10-11.) But the Moreman Affidavit simply offers no information about any of this. Instead, all it notes is that Defendant Lee at some point responded that inmates should respect "the female officer and her husband" so that he would not "have to discipline them." (Pl. Aff. Ex. H.) This does not point to knowledge or awareness of a longstanding issue or specific threat to Plaintiff.

Nor does the Scott Affidavit create a genuine issue of material fact. Scott maintains that assaults were a "continuous thing" at Green Haven but only notes that Defendant Lee "would deny the Complaints/Grievances." (*See* Pl. Aff. Ex. I at 2.) But as Defendant Lee explains, grievances are simply allegations that are subject to an investigation in which Defendant Lee is not involved. (Lee Aff. ¶¶ 5, 7, 15.) The mere fact that Defendant may have denied grievances and complaints does not speak to his failure to remedy any known disciplinary issues. *See Thompson v. New York*, No. 99CIV9875(GBD)(MHD), 2001 WL 636432, at *7 (S.D.N.Y. Mar. 15, 2001) ("[T]he Superintendent's adoption of the recommendation by the investigating officer cannot by itself demonstrate that he failed to remedy known misconduct."). Moreover, the Scott Affidavit ultimately does nothing to dispute Defendant Lee's contention that he was not aware of any "inmate allegations of assault on the part of CO Huttel, CO Erns, or Sergeant Malark[] *being substantiated* following an investigation."[20] (Defs. 56.1 ¶ 21 (emphasis added).)

Finally, the various lawsuits against the CO defendants does not indicate that Defendant Lee knew of a substantial risk of harm to Plaintiff.[21] To start, Defendant Lee maintains that, notwithstanding the existence of lawsuits, he would not have been "informed of lawsuits filed against Green Haven staff" unless he was a defendant. (Lee Decl. ¶ 21.) Plaintiff attempts to challenge this position (Pl. Aff. ¶ 28), but he provides no support to establish Defendant Lee's awareness and disregard of any of the identified lawsuits filed against Defendant Huttel before the November 21 assault. Indeed, a number of the lawsuits referenced by Plaintiff were filed and/or

---

[20] That Scott told Defendant Lee about the November 21, 2012 assault after it occurred is a non-sequitur. A failure to protect claim cannot be premised on a complaint about the very incident giving rise to the claim. *See Odom v. Calero*, No. 06 Civ. 15527, 2008 WL 2735868, at *7 (S.D.N.Y. July 10, 2008) ("The reference in case law to an official who 'fails to remedy' a violation logically applies only to ongoing, and therefore correctable, constitutional violations—not to a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded.").

[21] Plaintiff also includes a lawsuit filed in June 2014, which would have been filed a year and half *after* the alleged November 21, 2012 incident against Defendants Huttel, Erns, and Malark. *See Odom*, 2008 WL 2735868 at *7.

decided *before* Defendant Lee assumed his role as Superintendent of Green Haven (Lee Decl. ¶ 1 (noting that Defendant Lee assumed his role in 2009). (*See, e.g.*, Pl. Aff. Ex. J (attaching seven opinions, four that were filed and decided prior to 2009 and one that was decided *after* the alleged attack); *id.* Ex. K (lawsuit filed and decided prior to 2009).) In any event, these proffered opinions never address actual liability and, in some cases, reached a favorable decision for defendants.

The remaining lawsuits fair no better under closer scrutiny. One lawsuit was dismissed for failure to state claim, (*see id.* Ex. J (attaching *Green v. McLaughlin*, No. 07 Civ. 0263(TPG), 2010 WL 2034437 (S.D.N.Y. May 21, 2010)), while the other lawsuit was settled without an admission of liability (*compare id.* (attaching *Robinson v. Henschel*, 10 Civ. 6212(PGG), 2014 WL 1257287 (S.D.N.Y. Mar. 26, 2014)) *with Robinson*, 1:10-cv-6212-PGG, ECF No. 110 (S.D.N.Y. June 5, 2015) (stipulation of settlement with no admission of liability)). And in neither case was Defendant Lee a named party. Simply stated, these lawsuits—which never established liability— do not indicate that Defendant Lee could have had knowledge of a substantial risk of harm to Plaintiff, let alone that Defendant Lee was deliberately indifferent to any such risk. *Cf. Ortiz v. Annucci*, No. 17-cv-3620 (RJS), 2019 WL 1438006, at *5 (S.D.N.Y. Mar. 29, 2019) (dismissing claims for lack of personal involvement because the fact that an officer "had been previously sued by an inmate—without any allegation that this prior lawsuit yielded a determination of wrongdoing—and Plaintiff's unsupported allegation that [the officer] had been the subject of numerous prior complaints" did not establish deliberate indifference).

In sum, Plaintiff has failed to make a showing sufficient to establish that a genuine issue of material fact remains as to Defendant Lee's knowledge of a substantial risk of harm that Plaintiff faced. The Court GRANTS Defendants motion as to Plaintiff's failure to protect claim against Defendant Lee.

## B. Retaliation Claim

In addition to alleging an excessive force claim, Plaintiff contends that Defendant Lee retaliated against him by (1) appointing CHO Levine to find Plaintiff guilty, (2) instructing a sergeant to enter into the hearing room to intimidate Plaintiff, and (3) making multiple phone calls during the hearing in which he instructed CHO Levine to find Plaintiff guilty. (SAC Reply ¶¶ 29-31.) Plaintiff alleges that Defendant Lee engaged in this retaliatory conduct because of Plaintiff's "continuous complaint about the assault" by Defendants Huttel, Erns, and Malark. (*Id.* ¶ 31.) His allegations notwithstanding, Plaintiff concedes that he did not file a grievance related to any conduct stemming from his disciplinary hearing. (Pl. Aff. ¶ 43.) Nevertheless, Plaintiff contends that the circumstances warrant an exception to the requirement that he exhaust his available administrative remedies. (*Id.* ¶ 44.) Specifically, Plaintiff argues that Defendant Lee's conduct during the disciplinary hearing "thwarted Plaintiff from taking advantage of the grievance process through intimidation." (*Id.* ¶ 45.) The Court disagrees.

An inmate's failure to exhaust his administrative remedy may only be excused where the administrative remedy was "unavailable." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). This exception to PLRA's exhaustion requirement applies in three contexts: (1) when the administrative remedy "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* Administrative remedies have been deemed unavailable when a defendant's behavior, through machination, misrepresentation, or intimidation, prevents the inmate from asserting his or her rights under the given procedures. *Id.* at 1860. However, if there "has been no affirmative action

by prison staff actually preventing prisoners from pursuing administrative remedies, those remedies are not unavailable under the PLRA." *Grafton v. Hesse*, 783 F. App'x 29, 30 (2d Cir. 2019) (citing *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 178 (2d Cir. 2006)).

Here, the crux of Plaintiff's position is that Defendant Lee's alleged conduct during the hearing "caused Plaintiff to be intimidated from writing a grievance or exhausting his administrative remedies against [Defendant] Lee." (Pl. Aff. ¶ 45(a); *see also id.* ¶ 45(b).) Yet, as Defendants note, the evidence establishes that Plaintiff continued to participate in the grievance process—which ultimately involved Defendant Lee—for other issues he had at Green Haven, including *while the alleged retaliatory conduct was ongoing*. (*See, e.g.*, Fu Decl. Ex. L at DEFENDANTS 0009 (filing, on December 13, 2012, a grievance related to the November 21, 2012 incident); *id.* at DEFENDANTS 0005 (appealing Defendant Lee's March 11, 2013 grievance denial of his December 13 grievance); *id.* Ex. M at DEFENDANTS 0021 (filing, on March 6, 2013, a grievance related to February 14, 2013 incident); Pl. Aff. Ex. M at DEFENDANTS 0019 (appealing Defendant Lee's April 8, 2013 grievance denial of the March 6 grievance). On this factual record, Plaintiff cannot credibly maintain that Defendants "actually prevent[ed]" him from pursuing administrative remedies at Green Haven. *Grafton*, 783 F. App'x at 30. Nor has Plaintiff put forth any evidence that Defendants engaged in conduct that rendered the "grievance procedures de facto unavailable," such as threatening retaliation for filing a grievance or actual interfering with the filing of a grievance.[22] *See Ruggiero*, 467 F.3d at 178. Accordingly, the Court GRANTS summary judgment for Defendants, as Plaintiff failed to exhaust his retaliation claim against Defendant Lee.

---

[22] That Defendant Lee would have initially reviewed a grievance of which he was the subject does not excuse Plaintiff from exhausting his claims. *Albritton v. Morris*, No. 13-CV-3708(KMK), 2018 WL 1609526, at *12 (S.D.N.Y. Mar. 29, 2018) (rejecting proposition that defendant's "status as superintendent rendered the grievance procedures unavailable to Plaintiff.").

## II.     Plaintiff's Claims Against Defendant Benford

As it relates to Defendant Benford, Plaintiff has alleged that he "looked directly at []
Plaintiff and smiled and closed the gate[] while Plaintiff was going through," which caused the
gate to "slam" against Plaintiff.  (SAC ¶ 105.)  According to Plaintiff, Defendant Benford wanted
to "make sure that [] Plaintiff would not be able to threaten another female officer ever again."
(*Id.* ¶ 109.)  Defendants counter that, even if a genuine dispute exists as to Defendant Benford's
intentions, the undisputed evidence reveals that any purported use of force was *de minimis*.  (Defs.
Mot. 22-23.)

### A.  Excessive Force Claim

"To state an Eighth Amendment excessive force claim, an inmate must establish that the
conduct alleged is 'sufficiently serious' to reach constitutional dimensions."  *Hogan v. Fischer*,
738 F.3d 509, 515 (2d Cir. 2013).  This context-specific standard focuses on the harm done given
"contemporary standards of decency."  *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quoting
*Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).  Therefore, even if a plaintiff's injuries are minimal,
a defendant may be liable if he or she was applied force "maliciously and sadistically," as
"contemporary standards are always violated" in such circumstances.  *See Griffin v. Crippen*, 193
F.3d 89, 91-92 (2d Cir. 1999) (explaining that the fact that plaintiff "suffered only minor injuries"
did not warrant dismissal).  Nevertheless, "a *de minimis* use of force will rarely suffice to state a
constitutional claim."  *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).  "Not every push or
shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a
prisoner's constitutional rights."  *Lebron v. Mrzyglod*, No. 14-CV-10290(KMK), 2019 WL
3239850, at *14 (S.D.N.Y. July 18, 2019).

Here, Plaintiff has averred that, in closing a gate on him, Defendant Benford used force that caused "major pain" and injuries. (Pl. Aff. ¶¶ 55, 83(d)-(e).) The undisputed evidence, however, makes clear that, regardless of Defendant Benford's intention, the gate closure was not a sufficiently serious use of force. Specifically, Plaintiff failed to establish a genuine dispute as to whether Defendant Benford's use of force was anything but *de minimis*. *See James v. Phillips*, No. 05 Civ. 1539(PKC)(KNF), 2008 WL 1700125, at *5 (S.D.N.Y. Apr. 9, 2008) ("[P]laintiff need not show a significant injury but he must come forward with more than a *de minimis* use of force.").

At the outset, the medical records proffered by both parties reveal that the injuries Plaintiff sustained as a result of the gate closure were not significant. According to the IIR, medical personnel concluded that Plaintiff had full range of motion in both his shoulder and lower back, and there were "no visible injuries anywhere on [Plaintiff's] body." (Fu Decl. Ex. I at DEFENDANTS 0028.) In fact, the only identified injury was that Plaintiff's shoulder was "tender to touch." (*Id.*) Further, in the AHRPR, medical providers noted that Plaintiff was "in no obvious distress[] and appear[ed] in his normal state of health." (*Id.* at DEFENDANTS 0273.) Those records also reveal that Plaintiff already had pre-existing shoulder and back injuries related to a prior, unrelated incident. (*See* Pl. Aff. Ex. N at DEFENDANTS 0276.)

Of course, as already noted, minor injuries will not alone necessarily absolve a defendant of liability from an excessive force claim. Nonetheless, even if Plaintiff's minor injuries do not end the inquiry, Defendant Lee affirmed that the gate closes slowly (Lee Decl. ¶¶ 6, 8), a factual contention that Plaintiff does not challenge and that is supported by a video demonstrative submitted by Defendants as an exhibit (Fu Decl. Ex. H).[23] When coupling Defendant Lee's

---

[23] Plaintiff has challenged the admissibility of this video, arguing that that the "video demonstration does not depict the gate on the day of the incident." (Pl. Aff. ¶ 62.) As already explained, Plaintiff has not disputed the accuracy of the video's portrayal of the speed at which the gate closes. In any event, Defendant Benford has affirmed that the video of the gate is a "true and accurate depiction of the gate in question opening and

undisputed factual explanation with the minor injuries detailed in Plaintiff's medical records, no reasonable jury could reach any other conclusion than that the use of force related to the gate-closing incident was, at most, *de minimis*. Nor, given the speed at which the gate closes, is there a basis in the record for this Court to conclude that Defendant Benford's conduct was either malicious or sadistic (even if, as Plaintiff contends, Defendant's conduct was retaliatory/malevolent). *See Reid v. Coughlin*, No. 86 CIV. 1351 (LAP), 1994 WL 23152, at *4 (S.D.N.Y. Jan. 26, 1994) (explaining that "regardless of whether or not [defendant's] motive was malevolent, the actions in which that motive was manifested were legally insignificant and not 'repugnant to the conscience of mankind'"); *see also Trelly v. Geiger*, No. 13-CV-6248 CJS, 2018 WL 573570, at *9-10 (W.D.N.Y. Jan. 26, 2018) (use of force was *de minimis* and not repugnant to the conscience of mankind where defendant "grabbed Plaintiff's throat with one hand and pushed him back on his bunk, causing Plaintiff to have monetary difficulty breathing" because "the force used here was so limited, both with respect to amount and duration"); *Warren v. Westchester Cty. Jail*, 106 F. Supp. 2d 559, 569 (S.D.N.Y. 2000) (no excessive force where correction officer approached plaintiff, told him "Don't ever tell me how to do my job," pushed him in the arm to "move him along," and later "punched his right fist on the left side of [plaintiff's] face" and then "punched [plaintiff] once or twice more, including at least once while [plaintiff] was being restrained by one of the other officers"). As Plaintiff has failed to make a showing sufficient to establish the existence of sufficiently serious conduct necessary for an excessive force claim, the Court GRANTS Defendants' Motion.

---

closing," "shows the same point of view as plaintiff would have had," and depicts "the same speed" that the "gate opened and closed" on the February 13, 2013 incident. (Benford Decl. ¶ 8.) Defendant Benford's affirmation sufficiently authenticates the video, in turn allowing this Court to consider it with Defendant Lee's testimony. *See* Fed. R. Evid. 901(b)(1); 29A Am. Jur. 2d Evidence § 961 ("Ordinarily, testimony that an exhibit is a fair and accurate portrayal of the scene at the time pertinent to the inquiry is sufficient to satisfy the requirement that the scene is accurate.").

### B. Retaliation Claim

To the extent Plaintiff advances a retaliation claim related to the February 14, 2013 incident, summary judgment is also warranted. To successfully establish a retaliation claim under Section 1983, "a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Espinal*, 558 F.3d at 128 (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)). "While . . . the scope of conduct that can constitute actionable retaliation in the prison setting it is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim. *Dawes v. Walker*, 239 F.3d 489, 492-93 (2d Cir. 2001), *overruled on other grounds by Swierkiewciz v. Sorema N.A.*, 534 U.S. 506, 508 (2002). Rather, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Id.* at 493. Where the retaliatory conduct is "simply *de minimis*," it falls "outside the ambit of constitutional protection." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). This inquiry is "tailored to the different circumstances in which retaliation claims arise," although it accounts for the fact that prisoners "may be required to tolerate more than . . . average citizens." *Dawes*, 239 F.3d at 493 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999)).

Here, there is no genuine dispute of material fact (as previously explained) that Defendant Benford's use of force—hitting Plaintiff with a slow-moving gate—was, at most, *de minimis* in nature. In the context of First Amendment retaliation, such minimal use of force, as a matter of law, would not deter others from exercising their constitutional rights, such as filing grievances. *See, e.g.*, *Smolen v. Dildine*, No. 11-CV-6434 CJS, 2014 WL 3385209, at *7 (W.D.N.Y. July 9,

2014) (concluding that "the alleged use of force . . . consisting of 'pushing and pulling' Plaintiff while he was being examined by [a doctor] . . . is arguably not sufficiently serious to constitute an adverse action for purposes of a retaliation claim"); *Rivera v. Goord*, 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) (dismissing retaliation claim where acts complained of—shoving plaintiff while taking him to SHU—were *de minimis* and not actionable). The Court GRANTS Defendants' Motion as to any retaliatory claims against Defendant Benford.

### III. Conspiracy Claim

Plaintiff also appears to contend that Defendants Benford, Huttel, Erns, and Malark entered into a conspiracy to use excessive force in retaliation for Plaintiff's alleged threatening of C.O. Drown. (Pl. Aff. ¶ 68.) To establish a conspiracy claim under Section 1983, a plaintiff must show "(1) an agreement between a state actor and a private party [or two or more state actors]; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Blue v. City of New York*, No. 14-CV-7836 (VSB), 2018 WL 1136613, at \*16 (S.D.N.Y. Mar. 1, 2018) (quoting *Pacicca v. Stead*, 456 F. App'x 9, 12 (2d Cir. 2011)); *see also Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). A conspiracy claim, however, only will stand "insofar as the plaintiff can prove the *sine qua non* of a § 1983 action: the violation of a federal right." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995).

Here, Plaintiff failed on summary judgment to establish a constitutional violation related to his excessive force and retaliation claims against Defendant Benford. As "Plaintiff has not produced sufficient evidence that a constitutional violation occurred to survive summary judgment, 'there can be no civil rights conspiracy to deprive that right.'" *Richardson v. N.Y.C. Health and Hosps. Corp.*, No. 05 Civ. 6278(RJS), 2009 WL 804096, at \*18 (S.D.N.Y. Mar. 25, 2009) (quoting *Young v. Cty. of Fulton*, 160 F.3d 899, 904 (2d Cir. 1998)) (granting defendants'

motion for summary judgment on a Section 1983 conspiracy claim where plaintiff failed to "establish that her constitutional rights were violated in her false arrest and malicious prosecution claims"). The Court therefore GRANTS Defendants' motion for summary judgment related to Plaintiff's conspiracy claims against Defendants Benford, Huttel, Erns, and Malark.

## CONCLUSION

For the forgoing reasons, Defendants' motion for partial summary judgment is GRANTED in its entirety. The Clerk of the Court is directed to terminate the motion at ECF No. 80 and to mail a copy of this Opinion and Order to the Plaintiff at the addresses listed below.

As there are no remaining claims against them, Defendants William Lee and Lee Benford are dismissed from the case and the Clerk is directed to remove them from the caption.

A Pretrial Conference is scheduled for January 24, 2020 at 10:00 a.m. The incarcerated *pro se* Plaintiff shall participate in the conference by telephone and Defendants' counsel shall appear in person. It is the responsibility of Defendants' counsel to make prior arrangements with the appropriate facility to have the *pro se* Plaintiff available via telephone.

Dated:     December 5, 2019                          SO ORDERED:
           White Plains, New York

                                              _____
                                              NELSON S. ROMÁN
                                              United States District Judge

Mail To:  Tyrone Peters
04-A-4361
Wende Correctional Facility
3040 Wende Road
Alden, New York 14004-1187

Tyrone Peters
04-A-4361
Clinton Correctional Facility
P.O. Box 2001
Dannemora, New York 12929